

SEALED
s/ MariaFujita

ORDERED UNSEALED on 07/24/2025    s/ MariaFujita

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                 Plaintiff,<br>     v.<br>SANG PHUOC DO LE,<br>  aka Andy Le,<br><br>               Defendant. | Case No. ____**25MJ3966**<br><br>**C O M P L A I N T**<br><br>Title 18, U.S.C., § 1343 –<br>Wire Fraud<br><br><br>**(UNDER SEAL)** |

The undersigned complainant being duly sworn states:

<u>Count 1</u>

Beginning in approximately January 1, 2022 and continuing up to and including at least December 31, 2023, within the Southern District of California, and elsewhere, defendant SANG PHUOC DO LE, aka Andy Le, did knowingly devise and intend to devise, with the intent to defraud, a material scheme and artifice to defraud and to obtain money and property from persons by materially false and fraudulent pretenses, representations, promises, and omissions of material fact, and for the purpose of executing and attempting to execute the scheme, knowingly caused to be transmitted by interstate commerce certain writings, signs, signals, pictures, and sounds, to wit: a wire transmission that traveled in interstate commerce from victim TPM's Chase Bank account in Garden Grove, California, to defendant LE's Bank of America account in El Cajon, California, on or about November 17, 2022, in the amount of approximately $792,500; all in violation of Title 18, United States Code, Section 1343.

<u>Count 2</u>

Beginning in approximately January 1, 2024 and continuing up to and including at least July 22, 2025, within the Southern District of California, and elsewhere, defendant SANG PHUOC DO LE, aka Andy Le, did knowingly devise and intend to devise, with the intent to defraud, a material scheme and artifice to defraud and to obtain money and property from persons by materially false and fraudulent pretenses, representations, promises, and omissions of material fact, and for the purpose of executing and attempting to execute the scheme, knowingly caused to be transmitted by interstate commerce certain writings, signs, signals, pictures, and sounds, to wit: a wire transmission that traveled in interstate commerce from victim JP's Charales Schwab account in North Carolina, to a PNC bank account controlled by LE while he resided in Oceanside, California, on or about February 15, 2025, in the amount of approximately $1,000,000; all in violation of Title 18, United States Code, Section 1343.

And the complainant states that this complaint is based on the attached probable cause statement, which is incorporated herein by reference.

*M. lyn Soligo*
_____
MARCIE SOLIGO, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 22nd day of July 2025.

_____
MITCHELL D. DEMBIN
United States Magistrate Judge

## PROBABLE CAUSE STATEMENT
*USA v. LE*

1.      The investigation was initiated by the San Diego Complex Financial Crimes squad when the FBI received a complaint about an individual named SANG PHOUC DO LE, aka Andy Le ("LE"), who was purportedly operating a scheme to defraud investors he sought in San Diego and elsewhere to invest in an alleged cell phone business. According to LE, he purchased bulk supplies of Apple iPhones and sold them overseas (i.e., Taiwan and China) for profit. However, based upon witness statements, business records, public records, and allegedly falsified documents provided by LE, no such business existed. Rather, the FBI obtained numerous records from casinos in California, Arizona, Nevada, and Florida, showing that LE deposited large sums of cash and, in some cases, had investors wire funds to such casinos, and thereafter, LE used these funds to gamble—not to purchase bulk supplies of iPhones.

2.      According to business records, text messages, and witness statements, at the time LE received investor funds for his alleged iPhone business, he promised investors a fixed-rate monthly return. As part of the scheme, LE offered enhanced fixed-rate monthly returns for investors who recruited others to invest in his alleged iPhone businesses. However, according to business records, text messages, and witness statements, LE did not provide the promised investor returns and oftentimes provided excuses as to why he could no longer pay such returns. In some instances, LE paid no returns.  In other instances, LE paid one or two monthly returns and then ceased payments.

3.      According to witness statements, LE represented his business under the name "MobileSky Holdings LLC" (hereinafter "MobileSky").  According to public records, LE is not affiliated with this business.  However, according to the owner of the business, MobileSky is not affiliated with LE or any iPhone business LE was purportedly operating. LE is not a partner and has no ownership in MobileSky. The owner of MobileSky said that in late 2021 or early 2022, LE came to his T-Mobile Store in Oakland, California, whereby LE brought some of his friends to buy iPhones and activate service. However, the store owner was later charged by T-Mobile for the iPhones that LE bought because the activations were cancelled or had not been paid. In the fall of 2022, LE asked the store owner to purchase iPhones for him. The owner went to different Apple stores and purchased iPhones for LE and shipped

them to San Diego. LE paid the owner for the iPhones plus $50 for each phone. The store owner estimated that LE purchased at most 20 iPhones and paid him approximately $20,000 or less. LE sent the payments through ApplePay, Zelle, and Venmo. LE told the owner the phones were a present or a sample for his business partners. According to the owner of MobileSky, LE asked him to purchase hundreds, if not thousands of iPhones, but the owner explained he could not do that. The owner of MobileSky never gave LE permission to operate any other business or investment program using the name "MobileSky" or any variation thereof.

4.     The owner of MobileSky reviewed a purported Apple Store receipt that contained part of the address of his T-Mobile store in Oakland, California. As discussed herein, this fake Apple Store receipt was sent by LE to victim TPM while LE was pitching TPM to invest in LE's alleged business called "MobileSky." The owner of MobileSky said the receipt did not come from his store because he operates a T-Mobile store, not an Apple Store. The owner also said he did not order 1,000 iPhones at a time, but rather quantities of ten to twenty at a time. According to Apple witnesses, this purported Apple Store receipt is not legitimate because when an Apple Store sells iPhones, it itemizes each phone with each phone's details. While the receipt below contains the address of the T-Mobile store, the owner noted that the receipt is missing the suite number:



5.     LE invited the owner of MobileSky to San Diego in or about 2022. While the owner was visiting LE, he saw LE driving a Lamborghini SUV. LE also showed the owner a backpack with casino chips inside. The owner believed the chips had "$10,000" printed on them and there were approximately 25 to 30 of them in a bag.

LE also showed the owner a three-inch stack of $100-dollar bills in his pocket. LE took the owner of MobileSky to meet his alleged business partners at a San Diego boba shop.

6.    In or about September 2022, the owners of a San Diego boba shop, BN and LN, met LE because they had the same interest and ownership of Lamborghinis. According to BN, LE told him he owned a business called "MobileSky."  LE told BN the business was located in Northern California. LE explained to BN and LN that there was a good market for cell phones and that was the basis for his business. LE also told BN and LN that they could invest in "MobileSky" and receive monthly returns on their investment.

7.    According to LN, BN and LN decided to invest with LE in his alleged business, "MobileSky."  In or about September 23, 2022, LN and BN signed an investment agreement with LE for $120,000. According to LN, LN provided LE with cash and wire transfers from her bank account to his bank account to make the investment. LN and BN decided to invest additional money in October 2022, and LN was approved for two business loans totaling more than $300,000. LN then paid approximately $300,000 as an additional investment to LE. In total, LN and BN invested approximately $500,000 with LE in September and October 2022. LE agreed to pay 15% each month as a return on the principal invested by LN and BN. However, according to LN and BN, LE failed to make all the required monthly interest payments as promised in the agreement. For example, on November 22, 2022, LE only paid BN approximately $20,000 of the $45,000 interest he owed him. Again, in December 2022, LE only paid BN approximately $20,000.

8.    In December 2022, LE took BN, LN, and other investors on a trip to Las Vegas. According to witness statements, BN and LN accepted LE's invitation to Las Vegas. During the trip, LE showed LN a backpack full of cash, and LE told her he was playing blackjack at the casino. According to BN, it was during this trip that BN witnessed LE gambling "like, big time." After the December 2022 payment by LE, neither LN nor BN received any monthly investment returns. LE continued to provide BN with excuses on why he could no longer make the payments. For example, LE told BN there was something wrong with his bank, that his account was frozen, and that the bank was figuring it out.

9.     BN stated that he kept in regular contact with LE about their investment returns. LE would agree to meet BN at casinos and other locations but would only pay him minimal amounts of cash as investment returns, rather than the monthly amounts owed. For example, on or about February 17, 2023, LE met BN and handed him $2,000 in cash.  On or about February 25, 2023, LE met BN again and handed him $5,000 in cash.  On or about March 10, 2023, LE met BN at a casino and handed him another $5,000 in cash.   These payments were grossly below the $75,000 monthly investment returns that LE owed LN and BN on their $500,000 investments.

10.     In the summer of 2022, TPM met LE at a luxury car "meet up" at the San Diego boba shop owned by LN and BN.  According to TPM, his girlfriend was friends with LN, and that is how TPM was introduced to LE. According to TPM, he learned from LE about his alleged cell phone business known as "MobileSky." TPM met LE again at a dinner, where TPM saw LE open a backpack full of cash and hand out cash to other alleged investors.

11.     On or about November 12, 2022, LE continued to recruit TPM to invest in his business by sending him a photograph of a package that allegedly contained iPhones. The package was addressed to LE with a return address purportedly from MobileSky in Oakland, California. According to TPM, the photograph was texted to him by LE to show evidence of LE's alleged business activities with MobileSky. The photograph is similar to a photograph sent by LE to BN as alleged evidence of LE's business activities with MobileSky.

12.     According to LE's bank records, he purchased Adobe ACROPRO on or about November 8, 2022 for $14.99.  According to Adobe's website, Adobe Acrobat Pro is a comprehensive PDF tool for creating, editing, managing, and collaborating on PDF documents.  Among these features, Acrobat Pro allows the user to create new PDFs from various sources, edit existing ones, and modify text, images, and other elements.  Moreover, on or about November 10, 2022, LE purchased Adobe PS CREATIVE for $20.99. According to Adobe's website, Adobe Creative Cloud includes various programs, including Photoshop, which contains image editing and design software.

//

//

13.  On or about November 16, 2022, LE texted TPM a purported receipt from Apple showing the purchase of 1,000 iPhones for $1,230,794.44.  However, portions of the receipt were redacted in red by LE:



14.  The above receipt is not consistent with what Apple representatives have identified as necessary components of a valid Apple receipt. For example, Apple representatives explained that Apple itemizes each iPhone sold and includes the serial number to properly account for each product. Apple does not total the quantity of iPhones on one line item, as shown above. Rather, Apple would list each individual iPhone with their corresponding serial number on the receipt which facilitates tracking and returns.  Moreover, a review of the purported Apple receipt above, shows different fonts and sized text.  As noted above, approximately a week before LE texted the above purported Apple receipt to TPM, LE purchased two different Adobe software programs, which contained image editing software.

15.    After receiving the images above, TPM signed a promissory note with LE, whereby TPM paid a total of $812,500 to LE as his investment in LE's alleged business called "MobileSky" and would receive $130,000 per month as his interest payment. On or about November 17, 2022, LE went with TPM to Chase Bank near Garden Grove, California, whereby TPM authorized an interstate wire transfer in the amount of $792,500 to LE's Bank of America account in El Cajon, California. This bank-to-bank wire was processed through the Fedwire Funds Service.

16.    Based upon my training and experience, and information obtained from the Federal Reserve Bank of New York, since April 27, 2009, the processing of all wire transfers through the Fedwire Funds Service involves a multistep process, and two data centers located in New Jersey and Texas.  Therefore, every Fedwire funds transfer processed through the Fedwire Funds Service after April 27, 2009 has involved the exchange of electronic communications between Federal Reserve facilities in New Jersey and Texas.

17.    A few days after receiving the wire of $792,500 and cash of $20,000 from TPM, LE made a series of money transfers. However, LE did not use these funds to purchase iPhones.   Rather, LE withdrew $300,000 in cash and transferred approximately $398,000 to several car companies – West Coast Exotic Cars and Fusion Luxury Motors.  Based upon witness statements and business records, LE purchased luxury vehicles, including a green Lamborghini, as shown below:




18.    On or about December 10, 2022, LE allowed TPM to drive his bright green Lamborghini.  Afterwards, TPM began asking LE about his interest payment, which was coming due in mid-December 2022.  On or about December 17, 2022, LE texted TPM and said, "provision is verified 1.8 coming into the account." On or about December 21, 2022, LE made three separate wire transfers to TPM totaling $130,000. This was the only interest payment TPM received.

19.   Beginning in or about January 2023, LE provided excuses to TPM as to why LE did not have the cash to pay TPM his monthly interest of $130,000. For example, LE told TPM that LE's accounts were frozen because LE had made large cash deposits. LE also claimed he had problems with the Chex system because of his large Bitcoin purchases.

20.   After repeated attempts had failed to obtain his interest payments from LE, on or about April 6, 2023, LE's girlfriend sent TPM a text message: "Hey Tim? Andy's been out working he hadn't been home for days. He knows he has to take care of you. He's trying to sell all his investments to get capital. Just a little bit more patient with him. I don't know what [KDB] is trying to do, but threats will not be any help right now. We will be in contact with you."

21.   On or about April 13, 2023, TPM sent a text message to LE and told him he wanted his principal investment ($812,500) returned. However, TPM did not receive any further communication from LE.  As of the date of this affidavit, LE has neither returned the $812,500 to TPM nor made any further interest payments to TPM.

22.   At the same time LE was providing excuses to TPM on why he could not pay his monthly interest of $130,000, LE was pitching his "MobileSky" investment program to BA and GA.  LE told them they could invest in MobileSky and receive a fixed-rate monthly return on their principal of 17%.  BA and GA did not initially invest. Thereafter, LE continued to pursue them by taking them to lavish dinners and at least one complimentary trip to Las Vegas, where LE introduced BA and GA to other investors. After witnessing LE spend lavishly and gamble extravagantly in the casinos in Las Vegas, BA and GA felt confident to invest in LE's alleged company, MobileSky.

23.   According to business records and witness statements, BA and GA invested $100,000 with LE on or about February 15, 2023. When LE received this initial investment, however, LE did not use the funds to purchase iPhones. Rather, he moved the money between accounts for his girlfriend, withdrew $18,000 in cash, and sent approximately $69,000 to a casino in Las Vegas.

24.   On or about March 20, 2023, while TPM was contacting LE and asking about his overdue monthly investment returns, GA and BA signed two investments agreements with LE in the amounts of $550,000 and $425,000, respectively. The

next day, at LE's direction, GA sent a wire transfer of an additional $140,000 to a casino in Valley Center, California, located in San Diego County. After receiving the principal investments from BA and GA, however, LE failed to pay the first monthly return in April 2023. Thereafter, BA emailed LE seeking the payment, but LE only provided excuses. In the email, LE stated, in part: "I'm in a secure place working. Trying ti [sic] get everything fix and organize the situation.... There is nothing we doing is it Illgal [sic] he just doesn't want his formula to be leaked out [sic]. Is Business. My girl told me the situation and you guys went around asking everyone information and telling other people about investments is not cool. You told me to keep your business private and I did that so should you...." LE continued to tell GA and BA that their returns would be coming. On or about April 12, 2023, LE emailed BA and said, "...you will see wire transfer coming into your account soon." However, GA and BA never received a wire transfer, and LE never paid any returns and kept their entire principal investment.

25.    After numerous investors in LE's alleged "MobileSky" business realized they had been scammed and began demanding their money back, LE started using the company name MobileSky 2 LLC (hereinafter "MobileSky 2") to conduct the same or similar business model and expanded his scheme to a new pool of victim investors outside of California.

26.    DH and BH are owners of a financial company in Arizona. In early 2024, DH met LE through a friend and DH began providing LE with advice on LE's alleged cell phone business, which DH knew as "MobileSky2."  In September 2024, LE invited DH and BH to a casino in Arizona, where he paid for an expensive dinner and explained his alleged cell phone business. LE claimed that he was an authorized Apple reseller. LE also explained to DH and BH that he bought phones from Apple and shipped them to Taiwan to another reseller for profit. LE showed BH Apple receipts for purchases of hundreds of thousands of dollars in iPhones, as well as photos of boxes of iPhones. At the end of dinner, LE got DH and BH a complementary room for the night. LE continued to ingratiate himself with DH and BH by inviting their family to the hotel to swim and going to DH and BH's house for BBQs with his family.

27.    LE provided DH with various documents purporting to support the legitimacy of his business he called "MobileSky2."  For example, LE provided DH with a copy of a purported "MobileSky 2 Agreement," dated May 12, 2024, which LE represented

to DH assigned LE rights to be an Apple Reseller. While LE redacted portions of the document, including names and signatures, the document contained a notary stamp. But when the notary reviewed this document in June 2025, the notary stated that it did not appear to be a true and accurate notarized document performed by him because a valid notarized document by him would have a full one-page acknowledgment attached to the agreement, which was missing. LE's alleged Apple Reseller agreement also contained his notary stamp on the document itself; however, the notary does not place his stamp on the document, but rather on the acknowledgment page he attaches. The notary also noted that the handwriting used for the date next to his signature was not consistent with how he writes the number "2". Lastly, the notary reviewed his logbook, and it did not contain any notaries by him on May 12, 2024 – the date of the alleged Apple Reseller agreement.

28.    Apple conducted searches for reseller agreements between Apple and, among other entities and individuals, LE, MobileSky, and MobileSky 2. An Apple representative stated that they do not have and have not had reseller agreements with any of those individuals or entities.

29.    By mid-September 2024, LE convinced BH to invest approximately $52,900 with LE in his alleged "MobileSky2" business through a series of credit card payments. LE promised to pay BH a return of 12% on this principal investment. LE offered to pay DH and BH a commission if they brought additional investors into his program.

30.    Over the next six months, DH and BH brought in approximately seven to nine new investors to "MobileSky2." One of these investors was JP, who invested with LE in "MobileSky2" based upon the same representations LE provided to DH and BH. According to bank records, JP sent an interstate wire transfer from his Charles Schwab account in North Carolina to MobileSky2's PNC bank account, while LE was residing in Oceanside, California, on or about February 14, 2025, in the amount of $1,000,000. This wire was processed through the Fedwire Funds Service.

31.    LE also provided DH, BH, JP, and other investors with purported receipts from Apple. However, Apple representatives reviewed these purported receipts and identified numerous discrepancies between the original receipts identified by Apple and the ones provided by LE.  For example, the ones provided by LE lacked tax inclusion, contained inaccurate bulk unit orders, had differing fonts on the same receipt, and failed to contain individual serial numbers for each device sold.

32.    A review of bank records and casino records revealed that LE took in victim funds and then moved those funds into casinos. For example, from November 2024 through February 2025, LE received more than $1.2 million from potential victims. This accounted for over 97% of the total inflows during that period. According to witness statements, LE claimed he used casinos like banks to explain to investors why he asked them, at times, to wire money to him at the casinos, which some investors did.  However, casino records show significant gambling losses by LE at various casinos in California, Arizona, and Nevada.

33.    A review of LE's criminal record reveals that he has been convicted of the following offenses in either state courts or Federal district courts, each punishable by a term of imprisonment in excess of one year:

| DATE | OFFENSE |
|---|---|
| 2005 | Second-degree burglary (felony) (Arizona) – two counts, sentenced to 60 days in jail and 5 years' probation<br>• 9/18/2007 – probation revoked, and LE sentenced to 3.5 years in state prison |
| 2007 | Second-degree burglary with two prior felonies (Arizona) – sentenced to 11.25 years in state prison<br>• 5/23/2016 – post-appeal, resentenced to 8 years and 11 months in state prison |
| 2017 | Transport illegal aliens for financial gain, 8 U.S.C. 1324 (SDCA) (Criminal Case No. 17CR0355-H) – sentenced to 21 months in federal prison, 3 years S/R<br>• LE's S/R expired, but he committed the instant offenses while on S/R unbeknownst to investigators |

34.    Since January 2025, investigators have learned that LE has spent a substantial amount of time as casinos in California, Arizona, and Nevada.  LE moved from Temecula, California to Oceanside, California. However, during the past couple months, LE has spent a majority of the time away outside the Southern District of California traveling between various casinos in other states.  For example, since June 25, 2025, LE has spent approximately six total days in this district with that time spread across several sporadic trips to San Diego.